RADER, Chief Judge,
dissenting.
Although a separate written description requirement, and the vague notion of “possession” that it embodies, still troubles me, see Ariad Pharm., Inc. v. Eli Lilly and Co., 598 F.3d 1336, 1361 (Fed.Cir.2010) (Rader, J., dissenting-in-part and concurring-in-part), I write today to ask the court instead to give full attention to the rules that it has created. The written description inquiry is a question of fact. Ariad, 598 F.3d at 1351. In this case, a jury found — in its role as a finder of fact — that the specification of U.S. Patent No. 7,713,-723 (the '23 patent) satisfies the written description requirement. In my judgment, substantial evidence supports the jury’s verdict, which deserves significant deference. Therefore, I would respectfully suggest that our written description rules urge reversing the district court’s post-verdict grant of judgment.
I.
The written description analysis requires an “objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art.” Ariad at 1351. In this field of technology, the level of skill is high. A skilled artisan would possess an advanced degree and have experience in sophisticated protein design and engineering techniques. See J.A. 11242-43. The jury found as a matter of fact that a skilled artisan would know to substitute an amino acid as the invention suggests. Indeed, the patent identifies thirty-three positions for beneficial mutation on a Termamyl-like alpha-amylase. In this field, the highly skilled artisan would find that disclosure more than adequate to direct the substitution of an amino acid at one of those positions. The jury made that finding. Substantial evidence supports that finding.
The specification of the '23 patent discusses variants of Termamyl-like alphaamylases with altered stability at “high temperature and/or low pH conditions, in particular at low calcium concentrations.” '23 patent col. 1 11. 30-33. The specification includes listings for seven different parent alpha-amylases (including both BSG and BLA), and explains that variants can be made “comprising an alteration at one or more positions ... selected from the group of [thirty-three positions].” Id. col. 7 11. 36-43. The specification teaches that any amino acid can be substituted at those positions. Id. col. 2 11. 21-30; see also J.A. 10256-57.
The specification also discloses two working examples, which used random mutagenesis to identify sixteen positions at which substitutions led to increased thermostability at pH 4.5, 90 0 C and 5 ppm *1352 calcium (the claimed conditions). '23 patent col. 25-26. The examples all use BLA as the parent alpha-amylase. Dr. Arnold testified that the specification fully discloses the tests for determining activity and thermostability at the claimed conditions. See J.A. 11248 (discussing disclosure in the '23 patent relating to assays). She also noted that these procedures were well-known in this field. Id.
The jury heard expert testimony that “finding the position where you can make a beneficial mutation is, in fact, the inventive step,” and that once those positions are known, the procedure for making the substitutions was routine and well known, as was the process for determining which substitutions would result in the desired properties. See J.A. 11228-48. Novozymes also presented expert testimony to support its assertion that, while the specification explains that each alteration may be a deletion, insertion, or substitution of an amino acid, or a combination of these, a skilled artisan reading the specification would have focused on substitutions. See J.A. 11263-70. Making and testing all nineteen amino acid substitutions at one position was routine and would only take one week. J.A. 11251. In other words, a team of ten scientists could test all thirty-three positions with relative ease.
The court states: “the 2000 application disclosed a potentially enormous number of alpha-amylase variants, encompassing all possible combinations among the seven disclosed parent enzymes, the thirty-three disclosed positions for mutations possible at each position, and the various possible combinations of individual mutations.... ” Majority Op. at 1342-43. This conclusion overstates the problem in a way that appeals to a lay audience but is routine to this field. Novozymes offered expert testimony that this calculation, while mathematically correct, is unrealistic because skilled artisans would not blindly try random combinations. J.A. 10935-36; see also Snitzer v. Etzel, 59 C.C.P.A. 1242, 465 F.2d 899, 903 (1972) (concluding appellee’s reliance on a theoretical calculation of billions of possible combinations was “hopelessly exaggerated” when the specification directed persons of skill in the art to fourteen ions that could be used “in various combinations”). This court might also have credited the patentee with reducing the original 500 total amino acid positions down to a mere thirty-three. J.A. 10936.
II.
In conclusion, the jury received expert testimony, heard from skilled protein engineers, reviewed visual aids and publication excerpts, and examined the patent document as guided by those skilled in the art, over an eight day trial. The jury was given a special verdict form asking whether DuPont had proven by clear and convincing evidence that the claims at issue were invalid for lack of written description. J.A. 216. The jury answered in favor of Novozymes, and substantial evidence supports this determination. Therefore, I would reverse the grant of judgment as a matter of law and reinstate the jury’s verdict.