53 CCPA
**Application of Walter SPORMANN and Joachim Heinke.**

**Patent Appeal No. 7599.**

United States Court of Customs and Patent Appeals.

July 21, 1966.

Herbert B. Keil, Matthew C. Thompson, Chicago, Ill., for appellants.

Clarence W. Moore, Washington, D. C. (George C. Roeming, Washington, D. C., of counsel), for Commissioner of Patents.

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Chief Judge WORLEY, pursuant to provisions of Section 294(d), Title 28, United States Code.

Before RICH, Acting Chief Judge, MARTIN, SMITH and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.*

RICH, Acting Chief Judge.

This appeal is from the unanimous decision of the Patent Office Board of Appeals,[1] petition for reconsideration denied, affirming the examiner's rejection of process claims 7 and 8 in application serial No. 56,353, filed September 16, 1960, for "Production of Solid Alkali Sulfites." No claim has been allowed.

In essence, the invention is a process of producing alkali metal *sulfites* from alkali metal hydroxides and/or carbonates by spraying the latter, in aqueous solution, into a dry gas containing sulfur dioxide, the temperature and humidity of the gas being such as to immediately vaporize the water to the end that very little *sulfate* is produced. The sulfate results from oxidation of the sulfite but this apparently does not occur to any great extent if the sulfite is dry immediately upon its production. Sulfate is particularly likely to form when the treating gas contains a large amount of oxygen as do waste gases which it is desired to use for economic reasons.

Claim 7 reads (breakdown ours):

7. A process for the production of solid alkali metal sulfite which comprises:

passing a finally dispersed aqueous solution of an alkali metal compound selected from the group consisting of sodium hydroxide, sodium carbonate, sodium bicarbonate, potassium hydroxide potassium carbonate, potassium bicarbonate and mixtures thereof,

into a substantially dry gas containing sulfur dioxide,

maintaining the temperature of said dry gas at a level such that the water

1. Consisting of Examiner-in-Chief Duncombe and Acting Examiners-in-Chief Behrens and Wyman, the latter writing the opinion.

introduced with the solution and formed by the reaction of the alkali metal and the sulfur dioxide is immediately vaporized,

and thereafter separating from the gas the solid alkali metal sulfite which is formed by the reaction of the sulfur dioxide and the alkali metal compound.

Claim 8 differs from claim 7 in two respects. (1) The finely dispersed solution of alkali metal compound is passed "into an upwardly directed stream" of the dry gas containing sulfur dioxide and (2) the temperature of the dry gas is maintained "between about 20 and about 150° C."

A typical reaction, producing sodium sulfite from sodium hydroxide and sulfur dioxide, is

$$2 \text{ NaOH} + \text{SO}_2 \longrightarrow \text{Na}_2\text{SO}_3 + \text{H}_2\text{O}$$

According to appellants' brief (emphasis ours):

It has long been known, of course, that sulfur dioxide ($\text{SO}_2$) can be reacted with alkali metal hydroxides or carbonates to produce sodium sulfite. Ordinarily, a solution of sodium hydroxide or the like is interacted with $\text{SO}_2$ gas. *There is one major drawback to the use of the known processes. The formed sulfite tends to oxidize,* especially in the presence of heavy metal ions. Sodium sulfite, for example, oxidizes to form sodium sulfate ($\text{Na}_2\text{SO}_4$). To prevent oxidation of the sulfite it was considered necessary to exclude atmospheric oxygen by using a concentrated sulfur dioxide gas containing relatively minor amounts of free oxygen or by carrying out the reaction between the sulfur dioxide and the alkali metal hydroxide in an inert atmosphere. The need for concentrated $\text{SO}_2$ gases made it *impossible to use roaster or waste gases* containing sulfur dioxide which are formed in great quantities during the production of sulfuric acid. The protective measure described above is difficult to carry out especially in a commercial process. It has also been suggested that

the oxidation of alkali sulfite be suppressed by adding substances to the solutions which are capable of binding heavy metal ions. In such processes, however, the substances which are added to bind the metal ions become impurities which contaminate the alkali sulfite.

A method was found by appellant-applicants whereby alkali sulfite can be obtained from alkali hydroxide or alkali carbonate and sulfur dioxide *without the concurrent formation of substantial amounts of alkali sulfate.* The process is carried out successfully without the addition of materials which contaminate the sulfite. In the process, a finely dispersed aqueous solution of an alkali metal hydroxide or carbonate or bicarbonate is passed (sprayed) into a substantially dry gas containing sulfur dioxide. *The temperature and relative humidity of the gas are maintained at such levels that the water introduced with the solution and formed by the reaction of the alkali metal and the sulfur dioxide is immediately vaporized.* Thereafter, solid alkali metal sulfite is separated from the gas. The *sulfite is formed instantly in the dry form and no longer is exposed to the action of oxygen which is present in the gas.* In the subject process, unlike the prior art processes, it is possible to use waste gases as a source of $\text{SO}_2$, which gases contain large quantities of oxygen (as much as 50 parts of oxygen per part of $\text{SO}_2$).

In the process, therefore, a finely divided liquid and a gas are passed into the reaction zone and *solid sodium sulfite particles and water vapor leave the reaction vessel.* The exact point wherein the transition from liquid to solid and vapor occurs is not precisely known. What is known is that the water must be vaporized in the reaction zone leaving only vapor and solid alkali metal sulfite.

Much of this discussion also appears in appellants' specification.

The examiner finally rejected the claims as unpatentable "over any of" the following patents:

| Haywood | 2,210,405 | Aug. 6, 1940 |
| Aydelotte et al. | 1,982,241 | Nov. 27, 1934 |
| Friedrich et al. | 1,091,429 | Mar. 24, 1914 |
| Strickler | 1,023,179 | Apr. 16, 1912 |

In his Answer, the examiner also said, "Appellants' process is considered nothing more than the application of this teaching of Friedrich et al. to a spray process such as is described in Aydelotte et al. Such a combination does not meet the provisions for patentability set forth in 35 U.S.C. 103."

The board said: "As recognized by the Examiner, the rejection on Strickler appears to be cumulative but we will sustain the rejection as being one on Friedrich et al. in view of Aydelotte et al. or Haywood."

Friedrich et al. disclose a process for making sodium sulfites wherein a raw material such as sodium hydroxide or sodium carbonate is passed in a *solid, powdered* form through a horizontal rotating drum having radial plates or helical screw threads which cause the solid raw material to be turned and transported through the vessel. Sulfur dioxide gas is passed in countercurrent flow through the material within the drum. The solid, crushed raw material contains "a definite quantity of chemically combined or hygroscopic water" throughout the entire process, the amount of which "is so calculated in each individual case, that the heat of the reaction occurring on the absorption of the sulfurous acid gas [$SO_2$] will partially or completely evaporate the water, so that the finished product issuing from the apparatus will exhibit the required degree of moisture or dryness." The amount of moisture is apparently selected so that the final product will be free flowing yet dustless. The invention is described as an improvement over, and is contrasted with, the then known (1910) "wet" process by eliminating the equipment, power, and related expenses necessary for separation of product from solution.

Aydelotte et al. disclose a process for reducing the sodium hydroxide (caustic soda) content of *solutions* containing a mixture of sodium hydroxide and potassium hydroxide (caustic potash). The patentees' objective is to produce caustic soda-caustic potash solution mixtures of certain ratios which they use in making synthetic indigo, the sodium sulfite being a mere by-product. The *mixture, in solution, is treated with* waste gas containing sulfur dioxide, "either by bubbling the gas through the liquid, countercurrent spraying of the liquid into the gas, or other means until a test portion when evaporated to about 50° Bé., cooled to about 46° C. and filtered shows that the ratio of mixed caustic has been changed to 40% of caustic soda and 60% of caustic potash." The whole batch of solution is then evaporated to about 50° Bé. and cooled to 40° C. Whereupon sodium sulfite precipitates and is separated by filtration or decantation. What remains is, of course, still a solution. According to the patentees, the "crude separated sodium sulfite, containing small amounts of potassium sulfite, occluded caustic, and other impurities may, for some purposes, be used without purification, or it may be partly purified by washing, depending on what purpose it is to be used for."

Haywood discloses a method for producing *calcium* sulfite, especially as filler for paper, whereby a suspension of milk of lime, contained in an "absorber" tank, is whipped up as a fine mist by an agitator into an overhead gas containing from 7% to 20% $SO_2$. The essentially water-insoluble calcium sulfite product falls back into the suspension. It is stated that the calcium sulfite suspension can then be pumped to a paper machine. Alternatively, the patent states:

If the material is to be shipped, it should first be dewatered to reduce it to a thick paste or a dry powder. However, if it is to be used near the source

of manufacture in a watery suspension, it may be used directly * * *.

As to temperatures in the "absorber" where the reaction between liquid and gas occurs, the specification says:

This temperature *under ordinary conditions will usually rise to about 70° C.* If desired the combustion gases [from a sulfur burner where $SO_2$ is generated for the process] * * * may be cooled to a certain extent by water introduced into the tower * *. This, however is not essential and may be dispensed with, if desired. *There is no objection to introducing* the gases into the absorber at a temperature of between 400° and 550° C. [Emphasis ours.]

Strickler discloses a process for producing sodium sulfites, an object of which is to prevent the formation of sulfates through oxidation, which is appellants' principal object. However, in the Strickler process, $SO_2$ gas is passed into a *suspension* of sodium carbonate in a saturated solution of sodium sulfite. A temperature of about 49° C. (120° F.) is disclosed.

Comparing appellants' process with the prior art, clearly the basic chemical reaction embodied in their process is old, as their specification acknowledges. Aydelotte et al. would also suggest to one skilled in the art bringing about this reaction by countercurrent spraying of a liquid containing caustic soda into a gas containing sulfur dioxide. The issue therefore is: would it be obvious to one of ordinary skill in this art to conduct the old reaction by such spraying under *all* the conditions set out in the claims and obtain appellants' results, i. e., would the invention as a whole have been obvious?

The board said:

Taking cognizance of the fact that spray drying is an old expedient for obtaining a solute in dry form, we fail to see that it is unobvious to modify the method taught by Friedrich et al. so that a solution of sodium carbonate, for instance, is passed in fine droplet form through the gaseous current comprising sulfur dioxide instead of the finely powdered carbonate of Friedrich et al., particularly as Aydelotte et al. and Haywood do show, at least, that it is old to spray an alkaline hydroxide or carbonate solution through sulfur dioxide gas to obtain the corresponding sulfite.

Both appellants and Friedrich et al. obtain a dry sulfite and in such a simultaneous drying and chemical reaction process it is thought to be a *mere difference in degree whether the water is present in such an amount as to dissolve the carbonate or is merely present as adhering water* (Friedrich et al., page 2, lines 42 to 49). We note that Friedrich et al. only require that a sufficient amount of water be present to permit the chemical reaction to take place. Those familiar with spray drying know that dry products can be obtained even though a large amount of water may be present with the material to be dried.

Appellant urges that his product does not have much sulfate as a contaminant. *Though not mentioned by Friedrich et al.*, this *seems* to be merely an additional characteristic *inherent* in their process, In re Arnold et al., 50 CCPA 1166, 1963 C.D. 400, 794 O.G. 502, 315 F.(2d) 951, 137 USPQ 330. [Emphasis ours.]

The board's reference to "spray drying" appears to have been injected as something of which it was taking judicial notice, without having been mentioned in any reference of record. While Aydelotte et al. and Haywood both disclose spraying of some sort, neither spray dries. While we have heard of spray drying, it is not a technique of which we would feel free to take judicial notice. We are of the opinion that if the Patent Office wishes to rely on what "Those familiar with spray drying would know," it must produce some reference showing what such knowledge consists of. So far as we can see, appellants do spray and their sprayed solution is dried. We are unable to find, however, any indication in the references that such a step would

have the effect which appellants sought and found, namely, a reduction of the undesirable oxidation of sulfite to sulfate in an old reaction tending to produce sulfate when the reactant gas contained large amounts of oxygen.

■ The board apparently thought that the minimizing of sulfate production would be *inherent* in the process of Friedrich et al. However, this is no support for a rejection for various reasons. Friedrich et al. make no mention of it, as the board conceded. Their process is not appellants' process. It is a reaction between solid, powdered material and gas, the only water present being chemically combined water and hygroscopic water; appellants react sprayed solution and gas. As we pointed out in In re Adams, 356 F.2d 998, 53 CCPA ——, the inherency of an advantage and its obviousness are entirely different questions. That which may be inherent is not necessarily known. Obviousness cannot be predicated on what is unknown.

The result of appellants' process is said to be a product low in sulfate content, notwithstanding the use of waste gas containing relatively large amounts of oxygen, an asserted advantage not challenged by the Patent Office. So far as the disclosures of the references are concerned, we have found nothing to suggest it.

Strickler appears to be the only reference which deals with the problem of preventing the formation of sulfate during sulfite production but appears to solve the problem only by avoiding its cause. Sulfur dioxide gas is passed through a solution rather than waste gas containing oxygen and sulfur dioxide. Appellants' brief states, without refutation by the Patent Office, that "It is well known, of course, that this [Strickler] process would only be successful where atmospheric oxygen is excluded and where heavy metal ions are not present." The Patent Office treats this reference as "cumulative" and places little reliance on it.

The solicitor devotes most of his short brief to a discussion of Haywood's process which is different in several respects. The argument attempts to show how the claims can almost be read on this reference, *distinguishing only*—but admittedly —in their references to the use of a "solution" and in naming the alkali metal reactants. Haywood is interested in producing *calcium* sulfite as a paper filler. It is not an alkali metal compound and therefore outside the claims. It is produced from a suspension, not a solution, of lime (CaO) or limestone (calcium carbonate, $CaCO_3$) brought into contact with a gas containing $SO_2$. No effort at all is made to dry the product or the gas. In fact, the conditions are such that as fast as the sulfite is formed it falls back into the suspension whence came the raw material. The gas treatment takes place in an "absorber" which is a vessel with liquid in the bottom having an agitator which revolves in the liquid and splashes it upwardly from its surface where it is contacted by the gas. Since the gas is exhausted through a stack the Patent Office would have us treat this as an "upwardly directed stream" within claim 8. We will not do so as this would distort the clear meaning of the claim when read in the light of the specification. Besides, gas flow in the absorbers is horizontal. Next, reliance is placed on Haywood's temperature disclosures. Here an obvious attempt is made to drag from its context something to meet claim limitations without regard to the true import of the claims. The argument is that *if* Haywood's gas is at 400° or 550° C., the gas would necessarily be dry gas and the water would necessarily vaporize immediately, as appellants' claims contemplate. But Haywood *teaches* that normally his gas will be about 70° C. This would not necessarily be dry, contrary to what is also contended, being below the boiling point of water. As to the higher temperatures mentioned, all that the patent says is that "There is no objection to introducing the gases into the absorber at a temperature of between 400° and 550°

C." What effect this would have by way of vaporizing water is speculative and would depend on how much gas flows into the absorber how fast, how cold the suspension is, contact time between the mist thrown up by the agitator and the gas at whatever temperature it may have reached, heat loss from the absorber, etc. What goes on in the absorbers is a decidedly wet process having nothing to do with drying. What goes into them is aqueous suspension and that is also what comes out of them.

Finally, the solicitor argues on the basis of Haywood's optional and later dehydration of his sulfite suspension to produce a shippable product that the immediate vaporizing and separation steps of the claims are met because it makes no difference that Haywood's supposedly dried particles fall back into liquid if *ultimately* they are *again* dried and separated. We think this is not taking the claims to mean what they say when interpreted as they must be, in the light of the specification. Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871. The solicitor's use of Haywood amounts to reading things into the reference that are not there and reading things out of the claims that are there. When this has been done, concededly the claims still do not read on Haywood and since this patent does not teach anything about immediate drying after reaction it does not make the invention obvious when added to Friedrich et al. who teach nothing about reacting solution with gas.

Our view is that one faced with the problem of how to use oxygen-containing waste gases in the production of alkali metal sulfites without undue production of sulfate would receive no suggestion from the references to spray a solution of the alkali metal compound into the gas stream under such conditions of temperature and relative humidity as to cause all water present to be immediately vaporized. This is the claimed invention and in our opinion its basic underlying concept is not to be found in the prior art of record.

The rejection of claims 7 and 8 is reversed.

Reversed.