Mayer, Circuit Judge, dissenting.
There is no need for this court to reach the issue of infringement because the three patents- U.S. Patent Nos. 8,017,150 B2 (the " '150 patent"), 8,603,514 B2 (the " '514 patent"), and 8,900,497 B2 (the " '497 patent")-asserted by Indivior Inc., Indivior UK Limited, and Aquestive Therapeutics, Inc. (collectively, "Indivior") are invalid as obvious. I therefore respectfully dissent.
I. Invalidity of the '497 and '514 Patents
Indivior's '497 and '514 patents are directed to sublingual films for delivering active ingredients. See J.A. 334-51, 412-25. According to Indivior, its patents provide a novel solution for attaining the active ingredient uniformity required in pharmaceutical films. Cross-Appellants' Br. 55-62. To the contrary, however, long before the priority dates of Indivior's patents, multiple prior art references taught both methods to manufacture sublingual films and techniques for achieving film content uniformity.
The earliest possible priority date for the '497 and '514 patents is October 2001. See J.A. 170. For well over a decade prior to this date, others had achieved uniform distribution of active ingredients on mucosally-administered films. U.S. Patent No. 4,849,246 ("Schmidt"), for example, recognized that "hitherto known proposals" for *1351 producing drug delivery films had been unable to achieve the drug content uniformity required by regulators. J.A. 70217 (1:60). Schmidt explained that with his claimed invention, which used a roll-coating method, "[t]he reproducible constant weight [was] only +/-2.5% for 20 g/m[2] and approximately +/-10% for 1 g/m[2] over [the] entire surface." J.A. 70219 (6:1-3). Schmidt further taught that by roll-coating with a "doctor blade," it was "possible to achieve a weight tolerance per surface unit down to +/-1%." J.A. 70219 (6:37-42).
Schmidt focused on the importance of viscosity in achieving uniformity, explaining that "[c]oating materials with ... a viscosity of approximately 30 to 10,000 cPs ha[d] proved particularly satisfactory" in ensuring "uniform active ingredient content." J.A. 70218 (4:50-59). Indeed, Schmidt specifically taught that by making the viscosity of a wet matrix sufficiently thick, one could successfully inhibit the movement of particles during the time it takes to dry the coated film. J.A. 70218 (4:20-59).
U.S. Patent No. 6,552,024 B1 ("Chen") likewise taught how to obtain uniform distribution of pharmacological active ingredients on a film. See J.A. 70210 (9:20-27), 70211 (11:7-15, 12:1-28). Specifically, Chen disclosed a process for making mucoadhesive oral thin films, explaining that after mixing and degassing the ingredients, "[t]he formulation [i]s then coated on the non-siliconized side of a polyester film at a wet thickness of 10 [millimeters] and dried in a hot air circulating oven at 50° [Celsius] for 9 minutes." J.A. 70211 (12:12-15). Notably, moreover, U.S. Patent No. 5,881,476 ("Strobush") disclosed drying a film from the bottom, see J.A. 70241 (9:44-51), and explained that the claimed method could be used to avoid introducing "mottle" into the final film product, J.A. 70239 (6:26).
Indivior's efforts to evade the overwhelming evidence of obviousness are unavailing. Indivior first argues that Schmidt does not disclose a film having the drug content uniformity required by the '514 patent. See Cross-Appellants' Br. 57. In support, it contends that Schmidt only teaches creating films with uniform weight, not with uniform active drug content. This argument is wholly without merit. On its face, Schmidt asserts that the methods it discloses can be used to create films meeting the uniformity requirements for the active ingredient of a drug. See J.A. 70217 (1:59-2:47). Schmidt specifically explains that the prior art was not able to achieve the requisite "uniform active ingredient distribution," J.A. 70217 (1:62), but that the claimed invention does not suffer from the same "disadvantage[ ]," J.A. 70217 (2:14-15).
Indivior suggests that Schmidt only measured weight uniformity rather than drug content uniformity. Cross-Appellants' Br. 57; see ante at 1344. This argument falls flat, however, given that Indivior's own patents acknowledge that weight uniformity is a proxy for active ingredient uniformity:
The additive weights of eight randomly selected dosage forms ... are as shown in Table 2 below. ... The individual dosages were consistently 0.04 gm, which shows that the distribution of the components within the film was consistent and uniform. This is based on the simple princip[le] that each component has a unique density. Therefore, when the components of different densities are combined in a uniform manner in a film, as in the present invention, individual dosage[ ] forms from the same film of substantially equally dimensions[ ] will contain the same mass. J.A. 353 (41:50-42:33).
Indivior also complains that even if Schmidt teaches how to create a uniform wet matrix, it does not teach how to maintain *1352 uniformity during the drying process. Cross-Appellants Br. 57; see ante at 1344-46. But Strobush teaches the precise bottom drying methods that the '497 and '514 patents rely upon to achieve uniform dried films. See J.A. 70239 (6:24-27) (teaching high-speed drying), 70241 (9:44-51) (describing an embodiment which uses "air foils ... located below the coated substrate" to dry from the bottom).
According to Indivior, a skilled artisan would not have turned to Strobush's bottom drying method because Strobush addresses "mottle," which is a surface defect, rather than drug content uniformity. Cross-Appellants Br. 57; see ante at 1345-46. To the contrary, however, Strobush defines "mottle" as "an irregular pattern or non-uniform density defect ." J.A. 70237 (1:59-60) (emphasis added). Given that "mottle" is defined as a non-uniform density defect, a skilled artisan would certainly have appreciated that a drying technique that reduces mottle could also be employed to reduce non-uniformity.
All the elements recited in the challenged claims of Indivior's '497 and '514 patents are explicitly disclosed in the prior art. Even if they were not, however, obviousness and anticipation are different beasts. While anticipation requires that a single prior art reference disclose each and every element of the claimed invention, see, e.g. , In re Smith Int'l, Inc. , 871 F.3d 1375, 1381 (Fed. Cir. 2017), obviousness demands a more "expansive and flexible approach," KSR Int'l Co. v. Teleflex Inc. , 550 U.S. 398, 415, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007). In evaluating obviousness, the pertinent perspective is that of an artisan endowed not only with "ordinary skill" and "ordinary creativity," but also with the capacity to recognize and deploy "predictable solutions" to well-known problems. Id. at 421, 127 S.Ct. 1727 ; see also Randall Mfg. v. Rea , 733 F.3d 1355, 1362 (Fed. Cir. 2013) ("In KSR , the Supreme Court criticized a rigid approach to determining obviousness based on the disclosures of individual prior-art references, with little recourse to the knowledge, creativity, and common sense that an ordinarily skilled artisan would have brought to bear when considering combinations or modifications.").
Here, given that Schmidt teaches uniform active ingredient distribution, J.A. 70217, the only real dispute on the obviousness question is whether a skilled artisan would have been motivated to dry films from the bottom rather than from the top, as explicitly disclosed in Strobush, J.A. 70241 (9:44-51). At the time of the purported invention described in the '497 and '514 patents, it was well-recognized that conventional drying methods-which shot hot air from the top of a drying oven-resulted in films that were overly dry and rippled, i.e., "overcooked," on top and wet, i.e., "undercooked," on the bottom. See J.A. 334 (3:33-57), 346-47 (28:58-29:1). The district court determined that a person of ordinary skill "would possess a bachelor's degree in pharmaceutical science, chemistry, or a related field, plus two to five years of relevant experience in developing drug formulations" and "would also be a member of a team, which would include an engineer or scientist with one to three years of relevant experience manufacturing and optimizing various types of film products using coating and drying processes." J.A. 169. There can be no dispute that such a person would have readily recognized that switching the location of the heat source from the top to the bottom would likely ameliorate the problem of films that were overly dry on the top and overly wet on the bottom. Indeed, any person having basic familiarity with a kitchen oven would certainly appreciate that, since hot air rises, heating an item from the bottom rather than the top facilitates uniform baking. See *1353 KSR , 550 U.S. at 419, 127 S.Ct. 1727 (explaining that "[g]ranting patent protection to advances that would occur in the ordinary course without real innovation retards progress"); id. at 421, 127 S.Ct. 1727 (stating that "[r]igid preventative rules that deny factfinders recourse to common sense" have no place in the obviousness analysis).
II. Invalidity of the '150 Patent
Indivior's '150 patent is likewise invalid as obvious. The district court erred in concluding that the '150 patent can claim priority to the 2003 filing date of its parent application, U.S. Patent Application No. 60/473,902 (the " '902 application"). See J.A. 198. To obtain the benefit of a parent application's filing date, "the claims of the later-filed application must be supported by the written description in the parent in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought." Anascape, Ltd. v. Nintendo of Am., Inc. , 601 F.3d 1333, 1335 (Fed. Cir. 2010) (internal quotation marks omitted). In this regard, "[e]ntitlement to a filing date extends only to subject matter that is disclosed; not to that which is obvious." Research Corp. Techs., Inc. v. Microsoft Corp. , 627 F.3d 859, 870 (Fed. Cir. 2010). Accordingly, "the parent application must actually or inherently disclose the elements of the later-filed claims." Id. ; see also PowerOasis, Inc. v. T-Mobile USA, Inc. , 522 F.3d 1299, 1306 (Fed. Cir. 2008).
The '150 patent is not entitled to rely on the priority date of the '902 application because that application nowhere conveys possession of the specific polymer component recited in independent claim 1. That claim requires low molecular weight polyethylene oxide ("PEO"), high molecular weight PEO, and a hydrophilic cellulosic polymer ("HCP"), and further specifies that the low molecular weight PEO must be at least 60% of the polymer component and that the HCP can be no more than 25% of the polymer component. J.A. 279 (57:36-54). The '902 application, however, does not suggest possession of a polymer component including at least 60% low molecular weight PEO and at most 25% HCP. Indeed, as the district court correctly acknowledged, the '902 application provides over ninety examples, and yet not one of them satisfies the limitations of claim 1. See J.A. 197.
In concluding that the '902 application supplied adequate written description support for claim 1, the district court relied primarily upon the following passage:
For instance, certain film properties, such as fast dissolution rates and high tear resistance, may be attained by combining small amounts of high molecular weight PEOs with larger amounts of lower molecular weight PEOs. Desirably, such compositions contain about 60% or greater levels of the lower molecular weight PEO in the PEO-blend polymer component.
To balance the properties of adhesion prevention, fast dissolution rate, and good tear resistance, desirable film compositions may include about 50% to 75% low molecular weight PEO, optionally combined with a small amount of a higher molecular weight PEO, with the remainder of the polymer component containing a[n] [HCP]. J.A. 70035.
On its face, however, this passage contradicts the court's reading. As discussed above, claim 1 requires that the low molecular weight PEO constitute "about 60% or more [of] the polymer component," J.A. 279 (57:54), but the passage relied upon by the district court states that the low molecular weight PEO can be as low as 50% of the polymer component. J.A. 70035. This passage further states that "[d]esirably" there should be "60% or greater levels of the lower molecular weight PEO in the PEO-blend polymer component," i.e., there *1354 should be at least 60% low molecular weight PEO in the blend of high and low molecular weight PEO. J.A. 70035. Importantly, however, requiring 60% or more low molecular weight PEO in the "PEO-blend polymer component" is very different from requiring 60% or more low molecular weight PEO in the component consisting of low molecular weight PEO, high molecular weight PEO, and HCP as claim 1 requires. Even more fundamentally, the passage relied upon by the district court says nothing about claim 1's mandate that the HCP can be no more than 25% of the polymer component.
"Requiring a written description of the invention limits patent protection to those who actually perform the difficult work of 'invention'-that is, conceive of the complete and final invention with all its claimed limitations-and disclose the fruits of that effort to the public." Ariad Pharm., Inc. v. Eli Lilly & Co. , 598 F.3d 1336, 1353 (Fed. Cir. 2010) (en banc). Nothing in the '902 application even arguably suggests possession of a polymer component including at least 60% low molecular weight PEO and at most 25% HCP as required by claim 1. Because the district court erred in concluding that Indivior was entitled to rely on the 2003 priority date of the '902 application, the asserted claims of the '150 patent are invalid as obvious.